721 So.2d 27 (1998)
Gurvis PORTER
v.
GAYLORD CHEMICAL CORPORATION and Continental Casualty Company.
No. 98 CA 0222.
Court of Appeal of Louisiana, First Circuit.
September 25, 1998.
*28 Kirk L. Landry, Baton Rouge, for Defendants/Appellants.
Edward Robinson, III, Baton Rouge, for Plaintiff/Appellee.
Before SHORTESS, C.J., and CARTER and WHIPPLE, JJ.
*29 WHIPPLE, Judge.
This action is a suit for workers' compensation benefits. The workers' compensation judge rendered judgment in favor of the employee, Gurvis Porter, III, finding that Porter was entitled to temporary total disability benefits and payment of medical expenses and that the employer, Gaylord Chemical Corporation ("Gaylord") was liable to Porter for penalties and attorney's fees. For the following reasons, we affirm in part and amend in part.

FACTS AND PROCEDURAL HISTORY
Porter's claim for workers' compensation benefits arises out of a chemical release which took place at the Gaylord Chemical Plant in Bogalusa, Louisiana in October of 1995. On October 12, 1995, a rail car on the Gaylord plant site began leaking nitrogen tetroxide. Porter, who was a chemical plant operator for Gaylord at the time, worked in direct proximity to the rail car during this period of time assisting in efforts to contain the leak.
Despite these efforts, the tank car finally exploded on October 23, 1995, resulting in a large release of nitrogen tetroxide. Although Porter was not at work at the time of the explosion, he was called in to work within an hour and a half after the explosion, worked through the night, and worked his regular shifts for the two days following the explosion, until the situation was brought under control.
Following the explosion, Porter was hospitalized on two occasions for treatment of chemical rhinitis, which is an inflammation of the upper respiratory airway, and chemical bronchitis. Despite the persistence of his symptoms, Dr. Lee Roy Joyner, Jr., Porter's treating pulmonologist, released him to return to work on January 11, 1996, with the express stipulation that if Porter experienced any difficulties, he was to report to the clinic immediately for testing. Porter did return to work as of January 11, 1996, and at that time, Gaylord discontinued paying him weekly compensation benefits. However, because of an increase in symptoms, Porter could not continue to work after three weeks on the job. Thereafter, by report dated March 7, 1996, Dr. Joyner recommended that Porter not return to work at Gaylord due to his worsening symptoms.
However, at that point, Gaylord did not reinstate Porter's workers' compensation benefits. Gaylord did continue to pay for Porter's prescriptions until June 1996, at which time all workers' compensation payments to Porter were stopped.
Accordingly, plaintiff filed a disputed claim for compensation, and a hearing was conducted on September 24, 1997. Following the hearing, the workers' compensation judge found that Porter had met his burden of proving that he was temporarily, totally disabled as a result of the October 23, 1995 chemical release and that Gaylord had "acted arbitrarily, capriciously and without probable cause" in terminating Porter's compensation benefits. Thus, judgment was rendered, ordering Gaylord to pay Porter weekly compensation benefits from October 23, 1995, until Porter's condition changes, and medical expenses, with a credit to Gaylord for payments already made.[1] The judgment further provided that because Gaylord had acted arbitrarily, capriciously and without probable cause in terminating benefits, Gaylord was liable to Porter for "12% interest on his weekly workers' compensation payments" and $3,500.00 in attorney's fees.
From this judgment, Gaylord and its insurer, Continental Casualty Company, appeal, asserting that the workers' compensation judge: (1) committed manifest error in awarding Porter temporary total disability benefits and in awarding indemnity benefits; *30 and (2) committed legal and manifest error in awarding 12% interest and $3,500.00 in attorney's fees.

ASSIGNMENT OF ERROR NO. ONE
Gaylord first contends that the workers' compensation judge erred in finding that Porter had proved that he was temporarily totally disabled as a result of the chemical release. Additionally, Gaylord contends that Porter has also failed to establish any entitlement to supplemental earnings benefits because Gaylord made available to him a job within his restrictions at Porter's pre-injury wage rate.
Benefits for temporary total disability shall be awarded only if a claimant proves by clear and convincing evidence that he is physically unable to engage in any employment. LSA-R.S. 23:1221(1)(c); Gordon v. Sandersons Farms, 96-1587, p. 8 (La.App. 1st Cir. 5/9/97); 693 So.2d 1279, 1285. A claimant is entitled to temporary total disability benefits if he shows that he is disabled at the time of trial and is still undergoing medical testing with an indefinite period of recovery, even if it appears reasonably certain that he will be able to engage in gainful occupation within a foreseeable period of time. Gordon, 96-1587 at p. 8; 693 So.2d at 1285.
The factual finding regarding whether a workers' compensation claimant has met his burden of proving disability must be given great weight and will not be overturned on appeal absent manifest error. Bazar v. Hull, 95-1427, p. 2 (La.App. 1st Cir. 2/23/96); 669 So.2d 603, 604. If there is evidence before the workers' compensation judge that furnishes a reasonable factual basis for such a finding, the workers' compensation judge's determination of facts will not be disturbed on appeal. Moreover, where there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact will not be disturbed upon review. Bazar, 95-1427 at p. 2; 669 So.2d at 604.
In the instant case, Dr. Joyner, Porter's treating pulmonologist, testified at length at the hearing. Dr. Joyner has continued to treat Porter since the time of the accident, and he explained that Porter had developed both RADS and RUDS, conditions which are permanent. RADS is an asthma-like condition where the entire bronchial lining has been irreversibly injured, and RUDS is a condition where the membrane of the sinuses has been permanently and irreversibly injured. As a result of the chemical irritant, Porter's bronchial tubes show scarring and marked derangement, and the bronchial tubes are now unable to maintain themselves free of infection. Additionally, there are large holes and gaps in the respiratory membrane of the nose and bronchial lining, which permit allergens to get deeper into the pores. As a result of these conditions, Porter is susceptible to asthma-like symptoms of spasm and tightness in the chest when exposed to any type of irritant or odor, which can result in a 50 to 60% drop in lung capacity.
Dr. Joyner also testified that in addition to RADS and RUDS, which have resulted in repeated infections, increased allergies and asthma-like symptoms, Porter has also suffered a neurotoxic injury as a result of his exposure to the nitrogen tetroxide. The symptoms of this disorder include profound short-term memory disorder, concentration skill abnormalities, severe chronic headaches, difficulty falling asleep, difficulty maintaining sleep, profound chronic fatigue syndrome and profound changes in temperament. Dr. Joyner explained that a new technology called a SPECT brain scan, which can measure cognitive brain function, demonstrated substantial injury to Porter's frontal lobes, temporal lobes and basal ganglia. Dr. Joyner believed that Porter's brain function had "profoundly improved" after hyperbaric oxygen treatments. However, in neurotoxic injuries resulting from exposure to nitrogen oxides, symptoms of the neurotoxic injury begin to return within three months of completion of the hyperbaric therapy. Thus, Dr. Joyner opined that the only treatment for Porter's brain injury would be hyperbaric oxygen treatments for the rest of his life.
Regarding Porter's disability, Dr. Joyner stated as follows:

*31 In my opinion, Gurvis Porter is totally and permanently disabled based on irreversible damage to his upper and lower airway as severe as it can get with RADS and RUDS and with a neurotoxic injury for which there is no permanent treatment which requires treatment forever unless new technology is developed.
When questioned about the physical restrictions which prevent Porter from working, Dr. Joyner stated that as a result of his pulmonary injuries, the environment in which Porter could work would have to be restricted to prevent exposure to irritants. He explained that if Porter is exposed to cold air or to any irritant odor, which could include cleaning agents and perfumes, he will be subject to a 50 to 60% drop in lung capacity, severe shortness of breath, tightness in the chest, postnasal drip, development of numerous allergies and repeated sinus infections.
Porter was also referred to Dr. Harold M. Ginzburg, a psychiatrist, for evaluation and treatment. Dr. Ginzburg first saw plaintiff on June 20, 1996, and continued to see Porter on a routine basis. In his September 24, 1996 report, Dr. Ginzburg diagnosed Porter with major depressive episode and post traumatic stress disorder, conditions which he related to Porter's work injury. He further reported:
It is my professional opinion, to a reasonable degree of medical certainty, that Mr. Porter's psychiatric condition is treatable to a degree that would permit him to reenter the work force, full-time, in a capacity that needs to be determined. At this point in time, he is temporarily and totally disabled.
In his March 20, 1997 report, Dr. Ginzburg noted that Porter was showing some improvement, but opined that Porter was not able to work at that time "because of physical and emotional difficulties." In his May 7, 1997 report, the last report of record, Dr. Ginzburg reported that Porter remained depressed, socially isolated and anxious. At no point in his reports of record did Dr. Ginzburg render an opinion that Porter's disability status had changed.
In addition to his treating pulmonologist and psychiatrist, Porter was evaluated by numerous other doctors, who rendered various (and somewhat divergent) opinions regarding Porter's degree of disability resulting from his pulmonary injury, neurotoxic injury and psychological condition.
Porter was evaluated by Dr. Thomas Schraeger, a board certified toxicologist, who rendered a report dated August 5, 1997. In that report, Dr. Schraeger concluded that to a "reasonable degree of toxicological probability," Porter experienced an injury to the respiratory system that will continue indefinitely. Dr. Schraeger further opined that the respiratory injury will likely lead to increased respiratory illness, either mild or major, and that the injury will become more manifest as Porter ages. According to Dr. Schraeger, Porter is also likely to continue to have increased headaches and more fatigue. He opined that Porter was clearly experiencing a cycle of fatigue, tiredness and poor sleep patterns, which has interfered with his professional, social and personal life. Although Dr. Schraeger did not opine that Porter was unable to perform any work, he concluded that Porter's breathing problems, headaches and fatigue will make regular work activities more difficult. Moreover, because of Porter's reactive airways, he opined that it is imperative that Porter stay away from dust, sudden changes in temperature, chemical processes, and fumes of any sort, including solvents, paints, printing materials and perfumes.
On the other hand, Dr. Henry Jackson, who specializes in diseases of the chest, examined Porter on two occasions, October 23, 1996 and December 4, 1996, at the request of Gaylord. In his December 13, 1996 report, Dr. Jackson concluded that Porter did have a significant bronchial injury at the time of his initial exposure to nitrogen tetroxide. Although he noted some evidence of bronchial irritability at the time he examined Porter, including difficulty recovering from a bronchial infection and wheezing, he opined that Porter's lung function was not impaired based on a normal result on lung function tests.
Gaylord also referred Porter to Dr. F. William Black, a psychologist who examined *32 plaintiff on August 20, 1997. Dr. Black concluded that although there was no evidence of cognitive dysfunction, there were "significant psychological factors" involved which may be the primary factors reducing Porter's cognitive efficiency and his ability to function effectively on a day-to-day basis. Dr. Black opined that there was no degree of functional disability secondary to a central nervous system dysfunction and that if Porter was disabled at all, it was secondary to emotional factors.
Porter was then examined by Dr. Donald Adams, a neurologist, on September 12, 1997, at the referral of Gaylord. Dr. Adams concluded that there was "no firm evidence" of any brain damage present and no evidence of cognitive dysfunction. Thus, he concluded that, based on brain function, Porter could re-enter the work force full-time with no limitations.
Dr. Rennie Culver, a psychiatrist, also examined Porter at the referral of Gaylord on July 3, 1997. In a report rendered on September 23, 1997, Dr. Culver stated that he concurred with Dr. Black's findings that there was no evidence of central nervous system dysfunction. He diagnosed Porter as suffering from adjustment disorder with some elements of anxiety and depression.
Having carefully reviewed the medical evidence of record and Porter's testimony, we find that this evidence provided a reasonable factual basis for the workers' compensation judge's finding that plaintiff is entitled to temporary total disability benefits. Generally, the testimony of the treating physician should be given greater weight because his conclusions are based on repeated examinations and sustained observations of the patient. Thomas v. Tony's Seafood, Ltd., 633 So.2d 675, 677 (La.App. 1st Cir.1993), writ denied, 94-0223 (La. 3/18/94); 634 So.2d 856. Indeed, this case in particular demonstrates the wisdom of such an evidentiary rule. Given the conflict in the medical evidence of record, we find no error in the workers' compensation judge's reliance upon the persuasive and well-founded opinions rendered by Porter's treating doctors, Drs. Joyner and Ginzburg, that Porter is disabled from work at this time.[2] Because we find no error in the factual determination that Porter is entitled to temporary total disability benefits, we pretermit discussion of Gaylord's alternative argument that Porter had failed to prove his entitlement to supplemental earnings benefits.

ASSIGNMENT OF ERROR NO. 2
Gaylord argues that because the evidence establishes that Porter is not entitled to an award of indemnity benefits, Porter's claim for benefits was reasonably controverted and no award of attorney's fees was due. Additionally, Gaylord asserts that the award of 12% interest on Porter's weekly compensation payments is not supported by any provision of law, and accordingly, making such an award constitutes legal error.
An employer or insurer who terminates compensation benefits in an arbitrary and capricious manner or without probable cause is subject to penalties and attorney's fees, unless the claim is reasonably controverted. LSA-R.S. 23:1201(F) and 1201.2; Gordon, 96-1587 at p. 10; 693 So.2d at 1286. The test of whether the claimant's right to compensation benefits has been reasonably controverted turns on whether the employer or the insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant. An employer or insurer must make reasonable efforts to ascertain the employee's exact medical condition before terminating benefits. Termination of benefits may be considered arbitrary when it appears that further medical information was required to make an exact determination of the employee's condition. Gordon, 96-1587 at pp. 10-11; 693 So.2d at 1286-1287.
Whether the refusal to pay benefits warrants the imposition of penalties and attorney's *33 fees is a factual question which will not be disturbed on appeal in the absence of manifest error. Bazar, 95-1427 at p. 2; 669 So.2d at 604.
In the instant case, Gaylord terminated Porter's weekly compensation benefits in January of 1996, when Porter returned to work for a trial period. However, when Porter discontinued work three weeks later due to medical problems he was experiencing, Gaylord did not reinstate weekly benefits. Gaylord contends that at that point, it offered Porter alternative employment within the restrictions placed upon him by his treating physician and that because Porter declined to accept that position, it was no longer liable for weekly indemnity benefits. We disagree.
After Porter's attempted return to work in January of 1996, Dr. Joyner issued a report to Gaylord, specifically stating that it was his recommendation that Porter not return to work at Gaylord at that time based upon Porter's medical condition. Thus, the work restrictions placed upon Porter by his treating physician at that time clearly showed that he was restricted from work at Gaylord. Gaylord had no further medical evidence at that time to demonstrate that Porter could in fact return to work. Thus, we find no error in the workers' compensation judge's determination that Gaylord had not reasonably controverted Porter's entitlement to benefits and that it was arbitrary and capricious in terminating those benefits, where the claim had not been reasonably controverted. Accordingly, Gaylord was properly deemed liable to Porter for penalties and attorney's fees.
With regard to Gaylord's contention that there is no basis in law for the imposition of a penalty in the nature of 12% interest on weekly compensation payments, the relevant statute providing for the imposition of a penalty, LSA-R.S. 23:1201(F), provides as follows:
Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever is greater, for each day in which any and all compensation or medical benefits remain unpaid ...; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. (Emphasis added).
Technically, Gaylord is correct in its assertion that the penalty provided in this statute is not in fact 12% interest on unpaid compensation. Rather, the penalty is calculated to be the greater of 12% of any unpaid compensation or medical benefits or $50.00 per calendar day, for each day in which any compensation or medical benefits remain unpaid. Thus, to the extent that the judgment technically mischaracterized the penalty herein as an award of interest, it will be amended.

CONCLUSION
For the above and foregoing reasons, that portion of the judgment awarding Porter $330.00 per week in temporary total disability benefits is affirmed. The award of $3,500.00 in attorney's fees is likewise affirmed. That portion of the judgment awarding a penalty is amended to provide as follows:
IT IS ORDERED, ADJUDGED AND DECREED that Gaylord Chemical Corporation pay to Gurvis Porter a penalty equal to 12% of any unpaid compensation or medical benefits or $50.00 per calendar day, whichever is greater, for each day in which any compensation or medical benefits remain unpaid.
Costs of this appeal are assessed against Gaylord Chemical Corporation.
AFFIRMED IN PART; AMENDED IN PART; AND RENDERED.
NOTES
[1] As part of his treatment for a neurotoxic injury resulting from the chemical exposure, Porter was receiving hyperbaric oxygen treatments from Dr. Paul Harch. These treatments were administered to alleviate short-term and long-term memory problems and to improve cognitive function. However, these hyperbaric oxygen treatments were considered to be experimental in the sense that there is no scientific or medical literature on the use of hyperbaric treatments for exposure to the particular chemical at issue herein, nitrogen tetroxide. Thus, the workers' compensation judge ordered that Gaylord would not be responsible for paying for these hyperbaric oxygen treatments. Porter has not challenged that portion of the judgment, which is now final.
[2] We note that while Dr. Joyner opined that Porter was permanently totally disabled, the workers' compensation judge noted that at another point in his testimony, Dr. Joyner had stated that Porter must have many restrictions for working. After considering all of the medical evidence and Porter's testimony, the workers' compensation judge concluded that Porter was temporarily totally disabled. Porter has not challenged this finding.